[Crim. No. 2454. Fifth Dist. Feb. 17, 1976.]

In re BABY BOY REYNA on Habeas Corpus.

COUNSEL

Gretchen A. Peterson for Petitioner.

Ralph B. Jordan, County Counsel, Peter C. Carton, Deputy County Counsel, and Stanley Simrin, under appointment by the Court of Appeal, for Respondents.

OPINION

**FRANSON, J.**—Proceeding in habeas corpus to secure custody of a child. Order previously made submitting matter, vacated, and a referee appointed to take evidence and determine facts as to whether award of custody to the father would be harmful to the child, and whether an award of custody to a nonparent is required to serve the best interests of the child. (Civ. Code, § 4600.)

### STATEMENT OF THE CASE

On April 14, 1975, David filed a petition for writ of habeas corpus in the Kern County Superior Court seeking to obtain the custody of his child from the Kern County Welfare Department Adoption Agency. A hearing on the matter commenced before Judge P. R. Borton on June 26, 1975, and the petition was denied on June 27, 1975, by a minute order without findings of fact.[1]

---

[1] On June 26, 1975, the respondent adoption agency filed a petition to declare the child free from David's parental custody and control on the ground of an alleged abandonment pursuant to Civil Code section 232. The matter (Kern County action No. F-430) was heard on October 3, 1975, and the petition was denied on January 14, 1976, the court finding that David had not abandoned his child for a six months' period as required by the statute. We take judicial notice of the abandonment proceedings. (Evid. Code, § 459.)

On August 15, 1975, David filed a petition for a writ of habeas corpus with this court. We issued an order to show cause and scheduled a hearing as to why the petition should not be granted. The matter was duly argued and submitted for decision on December 10, 1975.

## STATEMENT OF FACTS

We derive the facts from the evidence presented at the habeas corpus proceeding in the trial court. David, age 19, and Emily began dating sometime in 1971 in Hollister where they resided with their respective parents. David and Emily had sexual intercourse several times in 1974 and David asked Emily to marry him but she refused. Emily became pregnant in May or June 1974. She moved to San Luis Obispo to enter an education program. David came to visit her on several occasions. After he became aware that she was pregnant David again asked Emily to marry him but she again refused because she did not believe the marriage would succeed. David told his mother in November 1974 that Emily was pregnant and he was the father and wanted to marry her. Around Thanksgiving Emily moved to Bakersfield where she told her roommate of her pregnancy and of David's paternity. She also told her roommate she was going to put the baby up for adoption because she did not want the child to suffer and because a marriage to David would not succeed.

Emily visited the Kern County Welfare Department Adoption Agency on January 2, 1975, to see about relinquishing the baby. She told a social worker David was the father and that his parents lived in Hollister although she was not certain of his whereabouts. The child was born on January 24, 1975. David was named as the father on the birth certificate. The blood types of the baby and David are the same. Emily signed the statutory relinquishment form on January 28, 1975, relinquishing the custody of the baby to the agency.[2] The reason the relinquishment form was obtained by the agency so soon after the child's birth was that Emily was leaving for Texas.

The agency put the child in a foster home for about two weeks. The child was then placed in the "preadoptive" home of Mr. and Mrs. Steven

---

[2]Civil Code section 224n provides that the agency to which a child has been relinquished for adoption shall be responsible for the care of the child, and shall be entitled to custody and control of the child at all times until a petition for adoption has been granted. Any placement for temporary care, or for adoption made by the agency, may be terminated at the discretion of the agency at any time prior to the granting of a petition for adoption.

Camarillo where the child has lived continuously until the present time. Adoption proceedings have not been instituted by the Camarillos because they are awaiting a final determination of David's right to custody of his child.

On February 24, 1975, the agency sent a letter to David at his parents' address in Hollister informing him he had been named as the father; that Emily had signed the relinquishment; that before the child could be adopted his rights and responsibilities had to be discussed; and that his signature on the relinquishment would sever all ties and responsibility for support. The letter apparently was not received by David's parents. Thereafter, about March 1, when Emily was in Hollister she told David the child had been born and there were papers for him to sign in Bakersfield; this was the first information David had regarding the child's birth. David told his mother he wanted the child. David's mother called the agency in early March informing it of her son's wishes. The agency was surprised to hear from David; it had assumed Emily really did not know David's whereabouts. The agency explained this is why it did not maintain the foster home placement any longer than it did. David was advised to retain an attorney.

Louis Colson, adoption supervisor for the agency, visited David and his mother at the mother's home in early March. According to Colson the home was "fine." David told Colson he wanted the child but they did not discuss David's plans for the child. Colson did discuss the child's future care with David's mother.

At the time of the hearing below David had been living in Hollister with Gloria, his prospective wife, for about four months. Gloria, 29 years old, has 3 young children and has been separated from her husband for 6 years. She and David plan to marry when Gloria's divorce is finalized, and they intend to move to Watsonville for employment and schooling.

David was unemployed but was looking for a job. His gross earnings for the first half of 1975 were less than $1,000; in 1974 they were approximately $2,500. David had been expelled from high school because of truancy, had been arrested for burglary, and had paid a fine. He also had been accused of having beer in his high school locker. Two months before the hearing he had been arrested for drunkenness in public. David has a drinking problem; he obtained counseling for this problem on one occasion at the mental health department. The counselor believes that David needs further assistance but David feels his problem is solved.

Gloria did not finish high school but plans to do so. She has a job lined up in Watsonville. She knows about the baby whom she calls "Ray" and wants to raise him as she cannot have any more children. Gloria has experienced recent emotional problems stemming from the marriage of an earlier boyfriend. She sought psychiatric help and was placed in a hospital for a short period. While in the hospital Gloria's children stayed with her mother. The status of Gloria's children is being monitored by the San Benito County Welfare Department at Gloria's request because of her emotional problems. The social service worker handling Gloria's case believes that it possibly might be detrimental for another child to be placed in Gloria's home at present because of her emotional problems; however, no attempt has been made to take Gloria's children away from her. Gloria recently sprained her ankle and voluntarily placed her children in a foster home while she recuperated. She took a substantial amount of valium under a doctor's prescription for the pain. She also took some mescaline for the same purpose. Other than that she does not take drugs.

David's mother is willing to take the baby into her home until David is able to support him. She says the baby is part of their family and belongs with his family. If David is awarded custody he and Gloria will raise the child, although his parents would take over if he were unable to do so.

David apparently has never seen his child.

### SCOPE OF REVIEW

While this is an original proceeding in this court, the superior court's determination of the factual issues in the proceeding below is entitled to some weight. We are not foreclosed, however, from a further consideration of questions of law, including whether there is substantial evidence to support the lower court's findings of fact. (*In re Richard M.* (1975) 14 Cal.3d 783, 790-791 [122 Cal.Rptr. 531, 537 P.2d 363].) Although the trial court failed to make express findings in denying David's claim to custody of his child, the transcript of the lower court proceedings is part of the record before us, and we are permitted to review the evidence to determine if all necessarily implied findings are supported by the evidence, resolving all doubts in favor of the trial court's decision. (*Estate of Taylor* (1970) 6 Cal.App.3d 16, 21 [85 Cal.Rptr. 474]; *Hong v. Hong* (1965) 237 Cal.App.2d 239, 242-243 [46 Cal.Rptr. 710].)

The transcript indicates that the parties agreed that David had the burden of proof as to paternity and legitimation and the respondent agency had the burden of proof as to David's unfitness. (Evid. Code, §§ 115, 500.) In denying David's petition for custody, the trial court impliedly found that, although David may have proved he was the father,[3] he had not legitimated the child and he was not fit to raise the child. The trial court further impliedly found that the agency had complied with the statutory procedures for the relinquishment of the child by the mother.

For the reasons hereafter expressed, it is clear that the trial court did, not apply the correct standard in determining the custody issue.

### CIVIL CODE SECTION 4600 GOVERNS DAVID'S RIGHT TO CUSTODY

The Family Law Act in Civil Code section 4600 provides in pertinent part:

"In *any proceeding* where there is at issue the custody of a minor child, the court may, during the pendency of the proceeding or at any time thereafter, make such order for the custody of such child during his minority as may seem necessary or proper. If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to his wishes in making an award of custody or modification thereof. Custody should be awarded in the following order of preference:

"(a) To either parent according to the best interests of the child.

"(b) To the person or persons in whose home the child has been living in a wholesome and stable environment.

"(c) To any other person or persons deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child.

"*Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall*

---

[3]The evidence is uncontradicted that David is the father of the child. He acknowledged his paternity to everyone who was interested, and his name was placed by the mother on the birth certificate. That the trial court found David to be the father is further evidenced by the decision in the abandonment proceedings entered on January 16, 1976, holding that David had not abandoned his child.

*make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child."* (Italics added.)

The statute has been held to apply to all proceedings where custody of a child is in issue, including habeas corpus. (*In re B. G.* (1974) 11 Cal.3d 679, 695-696 [114 Cal.Rptr. 444, 523 P.2d 244].) Because David asserts his entitlement to the physical custody of his child against the agency's claim to custody based on the mother's relinquishment, the statute clearly applies.

Under section 4600, however, the question of whether David has legitimated his child is irrelevant to David's right to custody. Legitimation is relevant only to whether the child can be adopted by the Camarillos. For example, if David is found to have legitimated the child pursuant to Civil Code section 230, the legitimation is retroactive to the child's birth and both David and the mother would have had equal parental and custody rights as though the child had been born legitimate. (Civ. Code, §§ 197, 230; *In re Richard M., supra,* 14 Cal.3d at pp. 792, fn. 5, 793.) In this situation, the mother's relinquishment to the agency would not sever David's parental rights, and the child cannot be adopted without David's consent unless it is freed from his control pursuant to future proceedings under Civil Code section 232. (See Civ. Code, §§ 224, 232.)[4]

Even assuming legitimation, however, David would not ipso facto be entitled to custody of his child. Civil Code section 4600 provides that where custody is at issue between a parent and a nonparent, the court, under appropriate circumstances, and regardless of the custodial preference of a parent, may award custody to a nonparent without the consent of the parent if an award of custody to the parent "would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." (Civ. Code, § 4600; *In re B. G., supra,* 11 Cal.3d 679, 694-696.) The conflict between a father's custodial rights arising from a retroactive legitimation under Civil Code section 230 and the custody standard mandated by section 4600, must be resolved in favor of the latter statute. Thus, if David proves that he legitimated his child but the agency sustains its burden of proving that an award of custody to David would be harmful to the child, then custody must remain with the

---

[4] Although the trial court found in Kern County action No. F-430 that David had not abandoned his child this does not foreclose the possibility that David might abandon the child in the future if he is unable to obtain custody in the present proceedings.

agency. This is so regardless of the fact that the child cannot be adopted without David's consent or without an order adjudicating it free from his control. Moreover, although not entitled to custody, David might well be entitled as part of his parental rights as a legitimate father to reasonable visitation with his child. (Civ. Code, § 4601.)

On the other hand, even if it is determined that David has not legitimated his child and even assuming that the statutory procedures for relinquishment of the child by the mother have been complied with, he nonetheless will be entitled to custody under the parental preference doctrine set forth in section 4600 unless the agency meets its burden of proving that an award to David would be harmful to the child. Because recent cases define the parental preference rule as arising from the natural relationship between a parent and child rather than the legal relationship (*Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208]; *In re Lisa R.* (1975) 13 Cal.3d 636 [119 Cal.Rptr. 475, 532 P.2d 123]; *Cheryl H.* v. *Superior Court* (1974) 41 Cal.App.3d 273 [115 Cal.Rptr. 849]), we construe the word "parent" as used in section 4600 to include the father of an illegitimate child. (We decline to follow any suggestion to the contrary in *Cheryl H.* v. *Superior Court, supra,* 41 Cal.App.3d at p. 278.) To restrict the parental preference rule of section 4600 to fathers of legitimate children, in our opinion, would be to deny David the equal protection of the laws. *(Stanley* v. *Illinois, supra; In re Lisa R., supra.)*

Finally, assuming that the constitutional requisites of notice and hearing regarding David's fitness under the standards of section 4600 are satisfied, if David has not legitimated the child, and if he is not entitled to custody under the section 4600 standard, the mother's relinquishment enables the agency to place the child for adoption without David's consent. (Civ. Code, §§ 224m, 226.1; *Cheryl H.* v. *Superior Court, supra,* 41 Cal.App.3d at p. 277; *Guardianship of Truschke* (1965) 237 Cal.App.2d 75, 79-80 [46 Cal.Rptr. 601].)

From the foregoing we see that the issue of legitimation is irrelevant to whether David is entitled to custody of his child. However, as legitimation will determine whether the child can be adopted without David's consent or without a section 232 order freeing the child from his control, we believe it is to everyone's best interests to decide whether the evidence supports a finding of nonlegitimation.

Civil Code section 230 provides: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the

consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this Chapter do not apply to such an adoption."

David publicly acknowledged the child as his own; he told Gloria, his prospective wife, about the child and his wish to gain custody; he told Mr. Colson of the adoption agency that the child was his; and he filed a petition for habeas corpus asserting that he was the father of the child and demanding its custody.

In addition to public acknowledgment, legitimation requires that David receive the child into his family and treat it as legitimate. (Civ. Code, § 230.) The term "family" as used in section 230 has been broadly defined and is not restricted to a husband, wife and children, or even to blood relatives of the father. At most, it means that the father must have a home, a "settled place of habitation" of which he is the head and into which he receives the child. (*In re Richard M., supra,* 14 Cal.3d at p. 794.) At the time of the hearing, David was living with Gloria and her children. That he was the head of the household can be inferred from the fact that he intended to marry Gloria and bring his child into the home. He also could live with his parents. We must conclude that he had a home and a family.

David, however, was unable to physically receive the child into his home and to treat it as legitimate because the child had been relinquished to the agency and placed with the Camarillos before he had any contact with the child. David argues that because he has done all that lawfully can be done under the circumstances he should be deemed to have *constructively* received the child into his home. He cites the language in *In re Richard M., supra,* 14 Cal.3d at page 797, to the effect that "proud and public acknowledgment" of paternity may constitute constructive receipt into the family. David also relies on cases which have held that where, in addition to acknowledging paternity, a father of an illegitimate child indicates an intention to treat the child as his own, the requirements of section 230 are met, and it is not essential that the child actually be received into the father's home. (See *Blythe* v. *Ayres* (1892) 96 Cal. 532, 540 [31 P. 915]; *Lavell* v. *Adoption Institute* (1960) 185 Cal.App.2d 557, 561-562 [8 Cal.Rptr. 367]; *Estate of Abate* (1958) 166 Cal.App.2d 282, 289-290 [333 P.2d 200]; *Moreno* v. *Richardson* (9th Cir.

1973) 484 F.2d 899, 903-904; *Rodriguez v. Rodriguez* (N.D.Cal. 1971) 329 F.Supp. 597, 600.)

These cases, however, involve factual situations significantly different from the instant case. In *Blythe v. Ayres, supra,* the issue was whether the child had been legitimated so as to entitle her to inherit her father's estate; the court found a legitimation even though the father, who lived in California, had never seen his child who lived in England. The court was persuaded by the fact that the father and child had corresponded regularly during his lifetime, the father had supported the child, and had repeatedly expressed his continuing love for her. The legitimation holding in *Blythe v. Ayres,* was criticized by the Supreme Court in *Estate of De Laveaga* (1904) 142 Cal. 158, 169-170 [75 P. 790], as recently noted in *In re Richard M., supra,* 14 Cal.3d at page 795, footnote 9.

In *Lavell v. Adoption Institute, supra,* the mother and father had lived together continuously and represented themselves as husband and wife for approximately two years before the child was conceived and until about one week before the child's birth. The court ruled that an unborn child of unwed parents was an existing person for adoption purposes and that the father had legitimated the child before its birth.

*Estate of Abate, supra,* involved a dispute between a surviving child and the decedent's former wife to take under a will. The decedent had met the child's mother after separation from his former wife. Upon learning that the mother was pregnant with his child the father rented an apartment where he and the mother resided until 15 days after the child's birth when the father died.

In *Moreno v. Richardson, supra,* the dispute was over a surviving child's right to social security benefits on the father's death. The father had lived with the mother during her pregnancy and had contributed to her support. After the child's birth he moved out of the house only to satisfy the restrictions of the county welfare department.

In *Rodriguez v. Rodriguez, supra,* the issue was whether an illegitimate child was entitled to receive a serviceman's death benefits under a national service life insurance policy as against the claim of the serviceman's mother. In holding the child was entitled to the benefits, the court found that the serviceman had legitimated his child upon proof that he and the child's mother had seen each other continuously and wanted to marry before he went to Vietnam, but his mother had refused

to give her consent (he was a minor), and he had arranged to support the child from his military allowance.

In these cases, the court found that the father and the child, usually through the mother, had had some meaningful, personal contact or relationship after conception and upon which it could be said that the father had "constructively" received the child into his family.

A case similar to the present case is *Guardianship of Truschke, supra,* 237 Cal.App.2d 75, where it was held that the willingness and desire of a natural father to receive his child into his home, and his purchase of a crib, baby clothes and equipment, did not constitute a constructive compliance with the requirement of section 230 that he receive the child into his home. The court noted that Civil Code section 200 gives the mother of an illegitimate child the sole right to custody, and this necessarily implies the right to prevent a legitimation by the father by placing the child with others for adoption. (237 Cal.App.2d at pp. 79-80; see also *Adoption of Irby* (1964) 226 Cal.App.2d 238 [37 Cal.Rptr. 879].)

*Truschke* and *Irby* are disapproved in *In re Richard M., supra,* 14 Cal.3d at pages 797-798, insofar as they suggest that the consent of the mother is necessary to a legitimation by the father. However, these cases apparently still stand as authority that absent some relationship other than biological between the father and his illegitimate child there can be no legitimation. As stated in *In re Richard M., supra: "Adoption of Irby,* . . . and *Guardianship of Truschke,* . . . both involved situations in which the mother, because of her exclusive right to custody (§ 200), was able to prevent the father from establishing *any* relationship with the child, much less physically receive it into his family. On this basis, the courts concluded that the children had not been legitimated. *In the case at bench, it is undisputed that the child spent a great deal of time in his father's home, and that at all times after the child's birth their father-son relationship was recognized by all.* [Italics added.]

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"It is also noteworthy that in each of these . . . cases, '[t]he resolution of the issues . . . [therein did] not require the application of the policy of the law which favors legitimation, since in any event the child . . . [would] be legitimated, either by acknowledgment by its father . . . or by adoption . . . .' [Citations.] In the instant case, on the other hand, a finding that the father did not legitimate the minor would have the unfortunate effect of

returning the child to the status of illegitimate, with its attendant stigma and unfavorable legal treatment." (14 Cal.3d at pp. 797, 798.)

In the present case, there is no reason to apply the policy favoring legitimation. If David has not legitimated the child and is not awarded custody, the child will be adopted by the Camarillos. If he is awarded custody, the legitimation will be immediately effected by receiving the child into his family. In either event, unlike *In re Richard M., supra,* there will be no stigma and unfavorable treatment to the child.

We hold that because David never has had physical contact with his child, and because he never has had a personal relationship with the child's mother since the child was conceived, he cannot be said to have received the child into his family; thus, the evidence supports the trial court's finding that the child has not been legitimated. We emphasize, however, that legitimation will become effected immediately if David is awarded custody and physically receives the child into his family.

UNDER SECTION 4600, THE BEST INTEREST OF THE CHILD,
NOT DAVID'S UNFITNESS, IS THE ULTIMATE ISSUE.

█ We come now to the most important finding—that David is unfit as a parent. On several occasions the superior court ruled that, assuming David had proved paternity and legitimation, the only issue before it was David's fitness. In furtherance of these rulings, the court refused the agency's offer to prove that the child would be caused severe emotional and psychological harm if he were taken from the Camarillos and placed with David. This was error.

As previously noted, Civil Code section 4600 applies to all custody proceedings including habeas corpus. *(In re B. G., supra,* 11 Cal.3d at pp. 695-696.) While the statute declares a strong preference for a parent over a nonparent, it also evinces a legislative policy that, if the award of custody to a parent as against the claim of a nonparent would be harmful to the child, custody must be awarded to the nonparent. (*In re B. G., supra,* 11 Cal.3d at pp. 698-699.) Although custody may not be awarded solely on the basis of the welfare of the child, the best interest of the child is the overriding concern. (*In re B. G., supra,* 11 Cal.3d at p. 698.)

If a father is unfit to care for his child under the traditional standards of unfitness, such as neglect, cruelty, depravity or physical abuse (see Civ. Code, § 232; Welf. & Inst. Code, § 600), then obviously it will be

detrimental to place the child with the father, and placement with a nonparent will be made to avert the harm to the child. Moreover, in furtherance of the legislative purpose of placing the best interests of the child ahead of a parent's rights, even though a father is found to be fit in the usual sense, he nonetheless will be denied custody if it is shown that it would be harmful to place the child with him. (*In re B. G., supra,* 11 Cal.3d at p. 683.) For example, if it is shown that it would be emotionally and psychologically harmful to uproot the child from the care and love of the nonparents with whom it has been living for a substantial period of time and place it with the father with whom it has never had contact, then custody must remain with the nonparents. (See *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 706-709 [117 Cal.Rptr. 856].)

The evidence indicates that David is not unfit in the usual sense of the word. A father is not unfit because he has faults or would be found lacking as an ideal parent. Nor does a less-than-perfect home environment suggest incompetency as a parent. (*In re Raya* (1967) 255 Cal.App.2d 260, 265 [63 Cal.Rptr. 252].) An extreme case such as child-beating or neglect leading to malnutrition normally is required before a child may be removed from his parents. (See Civ. Code, § 232; Welf. & Inst. Code, § 600; see also *In re Raya, supra,* 255 Cal.App.2d at pp. 265-266; *Lois R.* v. *Superior Court* (1971) 19 Cal.App.3d 895, 901 [97 Cal.Rptr. 158]; *In re Luwanna S.* (1973) 31 Cal.App.3d 112, 115 [107 Cal.Rptr. 62]; *In re T. M. R.* (1974) 41 Cal.App.3d 694, 700-701 [116 Cal.Rptr. 292]; *In re Jeannie Q.* (1973) 32 Cal.App.3d 288, 303-304 [107 Cal.Rptr. 646].)

The evidence shows that David is often unemployed, that he has some sort of drinking problem, that he has a minor arrest record, that he did not complete his education because of truancy, and that he lives with an older woman with plans to marry her. This does not establish David's unfitness as a parent.

The next question is whether it would be detrimental in the sense of being harmful to the child to place him with David and Gloria. Gloria has been married before and has a recent history of emotional problems requiring professional help; her children were placed in a foster home when she sprained her ankle. The status of her children is being monitored by the welfare department due to her emotional problems, but the welfare department has not attempted to take her children from her custody. There was evidence that it might possibly be detrimental to place another child with Gloria at the moment because of her emotional problems.

We cannot infer from this that Gloria personally would be neglectful, cruel or harmful toward the child. However, Gloria's possible inability to handle another child in her family raises a question of whether placing the child with David and Gloria would be detrimental to the child. David, of course, argues that if his contemplated home with Gloria is unsatisfactory, the child can be placed with his parents until a suitable home environment is established. In any event, the evidence concerning Gloria's problems does not support a finding that David is unfit.

The inquiry, however, cannot end here. The agency offered to prove that severe psychological and emotional harm would be caused the child by its removal from the custody of the Camarillos where it has lived since it was approximately two weeks old. Under section 4600, such evidence should have been received along with any other evidence pertaining to the consequences of uprooting the child from its present environment and placing it with David. David, of course, should have been allowed to present any evidence showing that change of custody would not be harmful to the child.

As this is an original proceeding before this court, the question arises as to whether we are required to apply the standards of section 4600 to the facts as they presently exist rather than as they existed at the time of the lower court proceedings 10 months ago. Because the trial court failed to fully adjudicate the pertinent issues under section 4600, we hold that the best interests of the child require that the statutory standard be applied to the facts as they exist at the present time.

We conclude that a referee should be appointed (*see In re Croze* (1956) 145 Cal.App.2d 492 [302 P.2d 595]; 6 Witkin, Cal. Procedure (2d ed.) Appeal, § 484, p. 4439), and a hearing conducted forthwith to receive whatever evidence any of the parties wish to present on the question of the possible detriment to the child if it is placed with David by showing that his custody would actually harm the child and whether it is necessary to continue custody with the Camarillos to avert such harm. (*In re B. G., supra,* 11 Cal.3d at pp. 698-699.)

## PETITIONER'S DUE PROCESS RIGHTS TO NOTICE AND A FAIR HEARING HAVE BEEN SATISFIED.

Since *Stanley* v. *Illinois, supra,* all parents of minor children, illegitimate as well as legitimate, are entitled to a hearing on their fitness and competency as parents before their custody rights are severed. We

believed this protection applies to a father such as David who has never had contact with his child because of events beyond his control. (*See In re Lisa R., supra,* 13 Cal.3d at pp. 647-651; cf. *Cheryl H.* v. *Superior Court, supra,* 41 Cal.App.3d at p. 279.) As David will have a full hearing on his fitness to raise his child and whether it will harm the child to be removed from the Camarillos and placed with him, the due process requirements of *Stanley* v. *Illinois, supra,* and *In re Lisa R., supra,* will be satisfied.

■ David, however, contends that he has been denied equal protection of the law because he was not afforded a hearing *before* the agency accepted the mother's relinquishment and placed the child with the Camarillos. He argues that constitutionally he must be accorded the same rights as a married father and that, if he had been afforded a hearing promptly after the child's birth, he would have received custody because detriment to the child could not have been shown that early in the child's life.

While it is most unfortunate for David that the agency acted in a precipitous manner without careful investigation as to his whereabouts, we cannot unwind the clock and simply award custody to David because of the agency's misjudgment 11 months ago. To do so would be to disregard the best interests of the child as mandated by section 4600. Moreover, whatever one may think about the agency's conduct, it complied with the existing statutory procedures governing the relinquishment by a mother of an illegitimate child. (Civ. Code, §§ 224m and 226.1; *Cheryl H.* v. *Superior Court, supra,* 41 Cal.App.3d at pp. 277-278.) We are not prepared to hold that these procedures were constitutionally defective for failing to require a hearing before the mother's relinquishment could be accepted and the child placed in a preadoptive environment as David would have us do. Even if the then existing statutory procedures are held to be constitutionally invalid so that the mother's relinquishment would be a nullity, we still would be faced with the custody issue under Civil Code section 4600.[5]

STANDING OF PROSPECTIVE ADOPTIVE PARENTS

■ The persons who assume the roles of parents by raising a child in their home may in time acquire an interest in the "companionship, care,

[5]We note that the Uniform Parentage Act took effect on January 1, 1976. (See Cal. Legis. Sess., 1975-1976 Reg. Sess., ch. 1244, pp. 3440-3447.) Under the new law, notice and hearing must be afforded the natural father prior to the termination of his parental rights. Hopefully, the problems presented by this case will be avoided in the future.

custody and management" of the child. (*In re B. G., supra,* 11 Cal.3d 679, 692-693.)

"The status of the de facto parent received statutory sanction with enactment of [Civ. Code, § 4600] in 1969. Previously Civil Code section 138 distinguished only between awards of custody to parents and to nonparents; the Family Law Act, in Civil Code section 4600, added the stipulation that when an award of custody to the parent would be detrimental next in order of preference stands 'the person or persons in whose home the child has been living in a wholesome and stable environment.' " (11 Cal.3d at p. 693.)

We conclude that Mr. and Mrs. Camarillo, as de facto parents, should be permitted to appear as parties to assert and protect their own interests in the custody of the child.

### DISPOSITION

It is ordered that P. R. Borton, Judge of the Superior Court of Kern County, be and is hereby appointed a referee in this matter for the purpose of taking such further evidence as any party desires to offer pertaining to the welfare of the minor child, including any evidence relevant to possible harm—either physical, emotional or psychological—that would occur if the custody of said child is awarded to its father. Said referee is ordered to forthwith conduct hearings in this matter and promptly file with this court a report and recommendation as to the custody of Baby Boy Reyna under the standards specified in Civil Code section 4600.

Brown (G. A.), P. J., and Gargano, J., concurred.

The petition of the respondent Kern County Welfare Department for a hearing by the Supreme Court was denied April 22, 1976.