[No. D008141. Fourth Dist., Div. One. Jan. 3, 1990.]

In re SABRINA H., a Minor.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
WILLIAM McKENLEY BRIGHT, Objector and Appellant.

COUNSEL

Elsa Lynn Norbeck and Leslie Ann Rose for Objector and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Jodi L. Doucette and Gary C. Seiser, Deputy County Counsel, for Petitioner and Respondent.

OPINION

**NARES, J.**—William McKenley Bright (Bright), natural father of five-year-old Sabrina H. (Sabrina), appeals from a judgment entered under Civil

Code section 7017, subdivision (d),[1] terminating his parental rights and freeing Sabrina for adoption without his consent.

In June 1987 Latina H. (Latina), Sabrina's unwed mother, relinquished three-year-old Sabrina for adoption. Bright claimed parental rights. After a trial on the petition brought by the San Diego County Department of Social Services (DSS), the court found (1) Bright is Sabrina's biological father but not a presumed father under section 7004 and (2) adoption is in Sabrina's best interests.

Because we agree Bright is not a presumed father, we conclude the court correctly determined his consent is not required for Sabrina's adoption. Accordingly, we affirm the judgment.

## FACTS AND PROCEDURE

On March 23, 1984, Sabrina was born to 16-year-old Latina in Oceanside, California. Bright, the natural father, visited the hospital the day after birth and has never denied paternity. Latina and Bright neither cohabitated nor married. Bright neither supported Sabrina nor was he ever involved in her life.[2]

Sabrina and Latina resided in Oceanside with Latina's parents. However, in April or May 1986, Sabrina and her half-brother Anthony[3] were removed from Latina's custody and declared dependent children of the juvenile court. When DSS requested Bright's address, Latina offered several "hangouts" but was unsure of Bright's precise address. DSS initiated a parent search.

On June 26, 1986, after DSS located Bright at Tehachapi State Prison, Bright returned a phone message left by Pravinchandra Patel (Patel), the reunification social worker assigned to Sabrina's case. Patel explained Bright's right to a reunification plan, discussed the reunification process and requested that Bright call collect to keep DSS informed of his residence.

---

[1] All statutory references are to the Civil Code unless otherwise specified. When referring to statutory subparts we omit repetition of the word "subdivision."

[2] Both social workers assigned to Sabrina's case testified as to Bright's noninvolvement as well as his overall unfitness. Latina and her mother (Charlotte) testified they disapproved of Bright's lifestyle which included using and selling drugs at high schools, abusive behavior directed at Latina and others, and his criminal disposition. Bright's criminal history, including numerous arrests, primarily for burglary and drug-related offenses, was received into evidence. While Bright offered money to support Sabrina, Latina refused to accept because it was, in her words, "dirty" as it came from drug dealing.

[3] Anthony, born to Latina and fathered by someone other than Bright, is one year younger than Sabrina.

Patel further informed Bright of the next juvenile court hearing (the six-month review in Sabrina's dependency matter) and advised Bright he had a right to be present at the hearing.

On July 25, 1986, Patel received a letter from Bright requesting Sabrina's picture but stating no position regarding her custody. On August 29, 1986, Patel received a second letter from Bright, indicating his desire to have Sabrina placed with his mother, Jerry White (White).[4]

Because Bright could not be located for the six-month review, DSS initiated a second parent search. Patel addressed letters to two potential Oceanside addresses, but these were returned as undeliverable. In May 1987 Patel received a letter from White indicating Bright received the messages Patel left with White, but Bright had told White, "I don't want to deal with him [Patel]."

On June 19, 1987, after notifying Bright, Latina relinquished Sabrina for adoption. A DSS adoptability assessment indicated Sabrina and Anthony were adoptable. Wingate, the adoptions social worker, was then assigned to Sabrina's (and Anthony's) case.

On November 19, 1987, DSS, to facilitate Sabrina's adoption, filed the petition to terminate Bright's parental rights under section 7017. Bright's location was unknown but another parent search located him in Vista the jail. In December 1987 Bright responded to a DSS letter by calling Wingate collect. Bright indicated his desire to reunify and Wingate prepared a reunification plan, which Bright signed in the Vista jail on January 29, 1988.

On February 19, 1988, the court appointed Elsa Norbeck as counsel for Bright. On April 5, 1988, after a two-day trial where Patel, Latina, Charlotte and Wingate testified, the court granted DSS's motion for judgment under Code of Civil Procedure section 631.8.[5]

The court found Bright was Sabrina's natural father but not a presumed father under section 7004. The court further found Sabrina's best interests

---

[4] White did not appear at trial but has shown interest in adopting both Sabrina and Anthony. In July 1987 DSS conducted a home evaluation of White's residence. At that time, White was unemployed and living in a one-bedroom apartment with her daughter and son-in-law. Susan Wingate (Wingate), the adoptions social worker assigned to Sabrina's (and Anthony's) case, testified White would not allow Bright to be involved in Sabrina's life, based on White's fear of exposing Sabrina to her son's lifestyle.

[5] Bright did not testify. Because the petition was filed under section 7017, DSS initially argued the burden of producing evidence first fell on the alleged natural father (Bright) to prove he is a presumed father under section 7004, thus retaining parental rights. Therefore, unlike a trial under section 232 to terminate custody and control based on parental unfitness, the father presented his case first.

would be served if an adoption could proceed without Bright's consent. Accordingly, on April 28, 1988, the court entered judgment terminating Bright's parental rights.

DISCUSSION

Bright urges reversal contending (1) the court abused its discretion in finding he is a nonpresumed father, (2) even nonpresumed natural fathers are entitled to certain protections found in the Welfare and Institutions Code and (3) during the underlying dependency proceedings, he was denied certain statutory protections, due process of law, and reunification services.

I

THE STATUTORY FRAMEWORK

Section 7017 provides in pertinent part: "(b) If a mother relinquishes for, consents to, or proposes to relinquish for or consent to the adoption of a child who does not have (1) a presumed father under subdivision (a) of Section 7004 . . . and the alleged father, if any, has not, in writing, denied paternity, waived his right to notice, voluntarily relinquished or consented to the adoption, the agency or person to whom the child has been or is to be relinquished, . . . shall file a petition in the superior court to terminate the parental rights of the father. . . .

". . . . . . . . . . . . . . . . . . . . .

"(d)(2) If the natural father . . . claims parental rights, the court shall determine if he is the father. The court shall then determine if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child. If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, it shall order that his consent is necessary for an adoption. If the court finds that . . . it is in the child's best interest that an adoption be allowed to proceed, it shall order that [the father's] consent is not required for an adoption; such a finding terminates all parental rights and responsibilities with respect to the child. Section 4600 does not apply to this proceeding. Nothing in this section changes the rights of a presumed father."

In defining the rights of unmarried fathers, California's Uniform Parentage Act (§ 7000 et seq.) distinguishes between a "presumed father" and one who is merely a "natural father." (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 790 [218 Cal.Rptr. 39, 705 P.2d 362].) ■ The statutory purpose is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not. (*In re Tricia M.* (1977) 74 Cal.App.3d 125, 132-136 [141 Cal.Rptr. 554], cert. den. *sub nom.* in *Detrich* v. *Sheldon G.* (1978) 435 U.S. 996 [56 L.Ed.2d 86, 98 S.Ct. 1649] [statutory classification held constitutional as against due process and equal protection attacks].) Section 7017(d) reflects the Legislature's intent to give greater protection to the child's interests as opposed to the preferences of a purely biological father. (*W.E.J.* v. *Superior Court* (1979) 100 Cal.App.3d 303, 312 [160 Cal.Rptr. 862], disapproved on other grounds in *In re Baby Girl M.* (1984) 37 Cal.3d 65, 72 [207 Cal.Rptr. 309, 688 P.2d 918].)[6]

■ In *Tricia M.,* we recognized that a natural father who has shown no previous interest in providing a family atmosphere for his child should not be allowed to withhold consent to an adoption which would serve the child's best interests. (*In re Tricia M., supra,* 74 Cal.App.3d at p. 134.) Thus, only a statutory "presumed father" can withhold consent. (*Ibid.*; *Adoption of Alexander S.* (1988) 44 Cal.3d 857, 867 [245 Cal.Rptr. 1, 750 P.2d 778].)

Section 7004 lists the several ways in which a man may qualify as a "presumed father." Most of the listed conditions refer to actual or attempted marriage. The only condition relevant here is section 7004(a)(4), which raises the natural father's status to "presumed" if "[h]e receives the child into his home and openly holds out the child as his natural child."

■ Bright argues he is a "presumed father" under section 7004(a)(4) because he publicly acknowledged paternity and, within his limited circumstances, offered to receive Sabrina into his family. Thus, Bright, attempting to distinguish *Adoption of Marie R.* (1978) 79 Cal.App.3d 624 [145 Cal.Rptr. 122], argues he "constructively" received Sabrina into his home.

In *Marie R.,* the father argued a theory of "constructive receipt," claiming that because he offered support and the mother, by relinquishing the baby at birth, prevented him from receiving the child into his home, he

---

[6]One year after *Baby Girl M.,* the California Supreme Court decided *Michael U.*; here three concurring justices called for the overruling of *Baby Girl M.* In 1986, the Legislature did just that by amending section 7017 to state, "[s]ection 4600 [the parental preference doctrine] does not apply to this proceeding." (*Adoption of Christopher S.* (1987) 197 Cal.App.3d 433, 438 [242 Cal.Rptr. 866].)

qualified as a presumed father without proving actual receipt. The court disagreed, holding the pre-Uniform Parentage Act "constructive receipt" cases upon which the father relied were dependent upon "some actual contact between the natural father and the child." (*Adoption of Marie R., supra*, 79 Cal.App.3d at p. 630; see also *In re Reyna* (1976) 55 Cal.App.3d 288, 300 [126 Cal.Rptr. 138] ["In these cases, the court found that the father and the child, usually through the mother, had some *meaningful, personal contact or relationship* after conception and upon which it could be said that the father had 'constructively' received the child into his family." (Italics added.)].)

In *Michael U.* v. *Jamie B., supra*, 39 Cal.3d at pages 790-791, the California Supreme Court denied "presumed father" status, even though the father visited his son at the social service agency. After refusing to consent to an adoption, the father was denied further contact. The court, citing *Marie R.* and *Reyna*, strictly interpreted the section 7004(a)(4) "receipt" requirement, concluding "Michael is a natural father, not a presumed father, because he has not yet received Eric into his home." (*Id.* at p. 791.)

The record reflects Bright made several efforts to see Sabrina. He came to the hospital the day after Sabrina's birth. Latina testified he saw Sabrina a total of three times, but her parents had a rule that he was not to come to the house. Latina refused to allow contact, including when Bright would attempt to see Sabrina at the bus stop where Latina went to high school. These sporadic contacts, however, fall far short of evidencing any meaningful father-daughter relationship justifying use of the "constructive receipt" doctrine.[7]

We are not unmindful of the evidence showing Latina blocked several of Bright's attempts to see Sabrina. However, this fact alone does not persuade a court to apply "constructive receipt." (*Michael U.* v. *Jamie B., supra*, 39 Cal.3d at p. 791, fn. 3.)

Bright has never sought custody of Sabrina nor has he ever filed an action to establish paternity under section 7006(c). A judgment or order under section 7006 could provide the father custody or visitation privileges or "any matter in the best interest of the child." (§ 7010(c); *In re Tricia M.,*

---

[7] "Constructive receipt" was applied in older (pre-Uniform Parentage Act) cases when courts, furthering a policy to avoid stigmatizing illegitimate children, strained to find legitimation. California's Uniform Parentage Act, adopted in 1975, abolished the entire concept of legitimacy, replacing it with the concept of parentage. (*In re Marie R., supra*, 79 Cal.App.3d at p. 629.) In a proper case, "constructive receipt" could be applied to find "presumed father" status. However, in Sabrina's case, policy reasons *disfavor* application of "constructive receipt" because she will ultimately be adopted and received by parents, into a family. (*In re Reyna, supra*, 55 Cal.App.3d at pp. 300-301.)

*supra*, 74 Cal.App.3d at pp. 135-136.) ■ Further, "[w]here the mother has frustrated the natural father's efforts to hold the child out as his, the court may, *in a proper case,* first grant him custody, allow him to complete the conduct necessary under section 7004, subdivision (a)(4) to establish himself as a presumed father, and then make the appropriate order." (*Id.* at p. 134, italics added.)

Therefore, despite the wishes of the mother, under the Uniform Parentage Act the natural father may acquire "presumed father" status. (*Jermstad* v. *McNelis* (1989) 210 Cal.App.3d 528, 544 [258 Cal.Rptr. 519] [nonpresumed natural father filed complaint to establish the parental relationship].) ■ Finally, under sections 7006 and 7010, Bright, as Sabrina's natural father, could have filed an action to secure an order compelling visitation privileges. (*Griffith* v. *Gibson* (1977) 73 Cal.App.3d 465, 469-471 [142 Cal.Rptr. 176].)

"Constructive receipt," if it exists after California's adoption of the Uniform Parentage Act (and we are neither cited to nor have found any cases affirming the doctrine under similar facts), does not apply to elevate Bright's status to "presumed father." Bright and Sabrina never had a meaningful relationship or contact.[8] Bright never contributed to support Sabrina. Further, the record reflects Bright never even lived in a home into which he could attempt to receive Sabrina. (See *In re Reyna, supra,* 55 Cal.App.3d at pp. 298-301; *In re Richard M.* (1975) 14 Cal.3d 783, 795 [122 Cal.Rptr. 531, 537 P.2d 363] [suggesting "constructive receipt" doctrine *presupposes* the father has a home into which to receive the child].)

The purpose of section 7004 is to distinguish fathers who have shown interest in raising and providing for their children in a familial relationship with those showing no responsibility. (*In re Tricia M., supra,* 74 Cal.App.3d at pp. 132-136.) We conclude the court here did not abuse its discretion in finding Bright is not a "presumed father." Therefore, under section 7017(d)(2), Bright's consent is not required and his parental rights are properly terminated if adoption serves Sabrina's best interests.

## II

BEST INTERESTS OF THE CHILD

■ The court, after elaborating on Bright's criminal history and lack of responsibility, found "[Bright] is the natural father but that it would be in

---

[8]Patel and Wingate testified Bright never sent Sabrina any gifts or cards. Latina testified Sabrina did not know Bright and would start crying when he picked her up.

the best interest of the child to be free for adoption, clearly, conclusively, scientifically beyond a reasonable doubt." Bright does not dispute this finding. Instead, he urges reversal based on DSS's failure to provide him, in the underlying dependency proceedings, certain protections found in the Welfare and Institutions Code. Further, Bright argues he was denied due process and reunification services in the underlying dependency proceedings.[9]

Despite ruling against Bright, the court acknowledged his argument regarding possible dilatory actions on the part of DSS: "You make a cogent argument in one sense about the responsibility of [DSS], but I don't think we should ever put ourselves in a position so that we begin to follow a philosophy of government that requires any bureaucracy to be virtually a perfect bureaucracy. . . . [¶] The responsibility of a person who wants to claim fathership, parenthood, it seems to me has also a proactive responsibility and to put it on [DSS] and say, well, they haven't done enough, or they haven't reached out when he, it seems to me, *had been noticed*. . . ." (Italics added.) The court then elaborated on Bright's failure, from the time of Sabrina's birth, to meet the responsibilities of parenthood.

*"Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring."*(Lehr v. *Robertson* (1983) 463 U.S. 248, 260 [77 L.Ed.2d 614, 626, 103 S.Ct. 2985], italics added.) In *Lehr,* the United States Supreme Court held New York's Legislature was not constitutionally compelled to listen to fathers who "never had any significant custodial, personal, or financial relationship" regarding their child's best interests. (*Id.* at p. 262 [77 L.Ed.2d at p. 627.)

Recognizing this concept, section 7017 has the purpose and effect of placing the best interests of the child ahead of the preferences of a purely biological father. (*W.E.J.* v. *Superior Court, supra*, 100 Cal.App.3d at p. 312.) Therefore, we must address Bright's arguments in this light. (*In re Reyna, supra*, 55 Cal.App.3d at p. 304.)

In *Reyna*, the court noted that the Welfare Department Adoption Agency (Agency), in failing to afford the father a hearing before accepting the mother's relinquishment and placing the child in a foster home, acted in a "precipitous manner without careful investigation as to his whereabouts." (*In re Reyna, supra*, 55 Cal.App.3d at p. 304.) The court nevertheless refused to award him custody based on the Agency's initial "misjudgment"

---

[9] Bright charges DSS with dilatory conduct once custody was removed from him. However, because Bright never had custody of Sabrina, his argument is fundamentally flawed.

because to "unwind the clock" and remove the child from its stable environment would ignore the child's best interests as mandated by section 4600.[10] (*Ibid.*) The *Reyna* court further stated: "Moreover, whatever one may think about the agency's conduct, it complied with the existing statutory procedures governing the relinquishment by a mother of an illegitimate child." (*Ibid.*)

■ Here, DSS complied with applicable statutory procedures relating to rights of noncustodial fathers. In accordance with section 7017, Bright was given notice and an opportunity to be heard before his parental rights were terminated. (§ 7017(f).) He was represented by counsel and was further provided a reunification plan.[11] At trial, he was not precluded from introducing any relevant evidence under sections 7017 and 7004. We are neither cited to nor have we found any Welfare and Institutions Code provisions mandating a contrary application of sections 7017 and 7004.[12]

Regarding the underlying dependency proceedings, DSS acted with reasonable diligence considering Bright's transitory nature. After being located, Bright promptly received actual notice. Patel, attempting to involve Bright early in the proceedings, spoke with him approximately two months after Sabrina was declared a dependent. Bright appeared uninterested. DSS initiated several parent searches as Bright neglected to remain in contact, as requested by Patel. Patel mailed letters and left messages with Bright's mother.

In short, DSS made efforts to notify Bright that were "reasonably calculated" to apprise him of Sabrina's dependency matter. (*In re Larry P.* (1988) 201 Cal.App.3d 888, 893-894 [247 Cal.Rptr. 472], following *Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873, 70 S.Ct. 652].) Moreover, "[a]ctual notice is not always required, nor should it be. The matter could not be continued indefinitely, as it is the minors' best interests which are paramount here." (*In re Larry P., supra*, 201 Cal.App.3d at p. 895 [rejecting the mother's due process challenge].)

---

[10] As stated earlier, by the 1986 amendment to section 7017, section 4600 (the parental preference doctrine) no longer applies to the instant proceeding. (*Adoption of Christopher S. supra*, 197 Cal.App.3d at p. 438.) Section 7017, however, operates to afford primary consideration to the child's best interests. (*W.E.J.* v. *Superior Court, supra*, 100 Cal.App.3d at p. 312.)

[11] Bright signed the reunification plan in the Vista jail on January 29, 1988. Wingate testified the plan requires Bright have housing and a legal source of income to support the child, as well as avoidance of criminal activity.

[12] Welfare and Institutions Code section 361.5, pertaining to reunification plans, specifically applies to *custodial* parents whose *whereabouts are known.* Similarly inapplicable are the cases Bright relies upon concerning rights guaranteed to *custodial* parents (once custody is removed) under certain Welfare and Institutions Code provisions. As stated earlier, parental rights are greater when the father has taken affirmative steps towards parenting his child. (*In re Tricia M., supra*, 74 Cal.App.3d at pp. 133-136.)

Under the present circumstances, we are not prepared to "unwind the clock," ignoring Sabrina's best interests, particularly when, considering Bright's antisocial history and inability to fill his parental role, any lack of formal notice was nonprejudicial. (*In re Larry P., supra*, 201 Cal.App.3d at p. 896.) Even if Bright was heard from at an earlier stage in the dependency proceedings, the facts of this case indicate the result would likely have been the same.

Sabrina has a need for and right to stability, as well as parental role models. (See *Michael U.* v. *Jamie B., supra*, 39 Cal.3d at p. 795, fn. 7.) We conclude there was no abuse of discretion as the evidence fully supports the court's findings and conclusion. Bright's parental rights were properly terminated in order to allow Sabrina's placement in an adoptive home.

DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and Benke, J., concurred.