[No. C003203. Third Dist. May 15, 1989.]

TOM JERMSTAD, Plaintiff and Respondent, v.
NANCY McNELIS, Defendant and Appellant.

530

**COUNSEL**

Christian R. Van Deusen and Ted R. Youmans for Defendant and Appellant.

Karen Tustin, Nielsen & Tustin and Marianne E. Mahoney for Plaintiff and Respondent.

**OPINION**

**BLEASE, J.**—This is an appeal from a judgment in an action to determine the existence of a father and child relationship, under the Uniform Parentage Act (Civ. Code, §§ 7000-7021), by the mother of the child, Nancy McNelis. The judgment determined that Tom Jermstad is the natural father of McNelis's newborn daughter and awarded custody to him. McNelis claims a right to place the child for adoption superior to Jermstad's rights as a parent. She contends that the trial court incorrectly failed to require joinder of the prospective adoptive parents, had no power to render judgment in favor of Jermstad in derogation of her right to place the child for adoption, and incorrectly gave a parental preference to Jermstad.

 We hold that Civil Code section 7017, read in the light of federal constitutional law, accords the natural father a parental preference to the custody of his child where, as here, the father has diligently pursued an opportunity to establish a protected custodial relationship. The preference precludes measuring the best interest of the child by comparison of the natural father's circumstances with those of the putative adoptive parents. We will affirm the judgment.

### FACTS

McNelis met Jermstad in June 1986. They began dating. He is an office⌣ in the merchant marine and is required to go to sea periodically. Most such

trips are about a month long and then he has anywhere from two weeks to a month off. In the course of the relationship Jermstad came to spend about half of his nights at McNelis's house when he was not working. In December 1986 he telephoned her when he was out to sea and she told him that she was pregnant with his child. By stipulation it was established that they had had sexual relations during the period of conception and that she had not had sexual relations with any other man.

When Jermstad returned from sea they discussed living together or marriage. But she made the decision that that would not be a good thing to do. They discussed the possibility of having the child adopted. McNelis is a single parent on AFDC who attends school full-time. She testified that she knows the realities of being a single parent and wanted something better for the child. She thought adoption would be best. When she first talked to Jermstad about adoption, "he wasn't sure that he was real keen on it," however, he always said, "But I think it's in the best interest to do that. I think under the circumstances it's the best thing."

Jermstad testified that he did not want to give up his child from the beginning, but he could see no other option. He did not believe that he could obtain custody because of the nature of his employment. McNelis had selected the Ellisons as the prospective adoptive parents for the child in April or May. Jermstad told her that he was interested in custody of the child in July. She told that to the Ellisons. They met with Jermstad. They told him that if he wanted to pursue custody they would "back out." He talked with McNelis shortly after that. She said that if he fought for custody, she would keep the child for herself. She had told him that she considered herself unfit and in his view that was one of the main reasons she was giving up the child. He called the Ellisons and told them he was not going to seek custody.

In mid-July Tom Jermstad met Joanne Jermstad; he married her six weeks later. Joanne was a single mother with two daughters, aged 12 and 15, by a previous marriage. She told him that she could not have any more children. They were in love and she knew how much he wanted a child and did not want to give up his child by McNelis. Before he asked her to marry him she told him that she did not want to see him give up the child if they were to be married.

Joanne is a secretary/receptionist, but testified that she would be willing to give up that employment if it appeared warranted after the child came into their home. Her husband's salary would be sufficient to support their

household if this occurred. They live in a three-bedroom home and her daughters are very excited about the prospect of a new sister.

On August 20, 1987, the child was born. Jermstad was invited by the Ellisons to come to the hospital to see the baby. He announced that day that he intended to seek custody. On August 22 he married Joanne. On September 1 he filed the complaint in the El Dorado County Superior Court to establish the parental relationship from which the proceedings we review ensued. The complaint seeks a determination that Jermstad is the father of the child and an order awarding custody of the child to him. An order to show cause was issued for a hearing on September 11, 1987. On September 3 the Ellisons filed a petition for adoption of the child in the Nevada County Superior Court.

At the hearing on the order to show cause in Jermstad's action on September 11 McNelis appeared without counsel. An attorney appeared on behalf of the adoptive parents and urged that counsel be appointed for McNelis. The trial court appointed an attorney to represent her and directed Jermstad's counsel to notify the clerk of the Nevada County Superior Court of the pendency of the parentage proceedings. McNelis's counsel requested two weeks' continuance to file a demurrer. The matter was put over to September 25.

McNelis filed a demurrer on the ground that there was no subject matter jurisdiction and for a "misjoinder of parties." The minimalist memorandum of points and authorities in support of the joinder issue consists of a paraphrase of Code of Civil Procedure section 379, the *permissive* joinder provision. At the hearing on the 25th McNelis's counsel said that the Ellisons should be made parties since the child was residing with them. The trial court said that the position of the Ellisons was that the child had been placed with them subject to the natural father's right to assert his right to custody and that accordingly it was not really too concerned about joinder. Counsel for McNelis said "All right." Thereafter, the discussion turned to jurisdiction and McNelis's counsel conceded that issue. Then the court and counsel discussed the conduct of the impending proceedings.

Counsel for McNelis said he had discussed the matter with counsel for the Ellisons and was of the view that a rapid hearing under Civil Code section 7017 was required. McNelis told her counsel she was unwilling to stipulate that Jermstad was the natural father of the child. The court said that it would conduct a bifurcated hearing first addressing the issue of paternity and then, if favorable to Jermstad, whether the child should stay

with the natural father, go to the adoptive parents, or some other alternative. The matter was put over to September 30.

At the outset of the hearing on the 30th McNelis offered the stipulation concerning her sexual relations with Jermstad which concedes that he is the natural father of the child. Jermstad accepted the stipulation; the trial court found that he is the father of the child. The court inquired about the second issue and McNelis's counsel said it was whether or not it was in the best interest of the child that Jermstad be given his parental rights or that those rights be terminated. The court said "That would be your burden." McNelis's counsel said: "That's the way I read it, your Honor." Thereafter, McNelis's case was put on and then Jermstad's case.

In addition to the facts related previously the parties adduced conflicting evidence of Jermstad's character, personality, and experience in dealing with children. It suffices for purposes of this appeal to note that, on a view of the evidence in the light most favorable to the judgment, we must conclude that Jermstad has no defect of character or personality which would suggest a difficulty in parenting; he likes children and he gets along with them well.

At the conclusion of the hearing counsel argued the case with McNelis being given the right to begin and close. Near the end of her counsel's first closing argument he asked the court to allow adoption by the Ellisons who would be excellent parents. He asserted that Mrs. Ellison was "at home, taking care of one child already." Jermstad's counsel objected that there was no evidence adduced of that fact. The trial court said "The objection is good, if I haven't heard it. I think there was a stipulation, or at least I stated that I had no question that the Ellisons were able to provide a very suitable and desirable home. And I didn't take any evidence on that point. That's my frame of mind, that there's nothing derogatory certainly about the Ellisons' home and I consider it to be an excellent location." The court directed McNelis's counsel to continue. He did so. On two previous occasions in the proceedings the trial court had implied that detailed evidence about the Ellisons' circumstances was unnecessary. However, McNelis's counsel never argued the point of admissibility and never was barred from adducing such evidence by a ruling of the trial court.

Jermstad's counsel argued and concluded.

McNelis's counsel then made a brief final argument concluding as follows: "I think the demonstrated lack of interest goes to what is the truth

in this particular circumstance. Saying that if he wasn't interested he wouldn't be here, the only reason he's here is because other people want him to be here. Natural parents, yes, would be the best under most circumstances. This doesn't happen to be one of them. Thank you."

Thereupon the matter was submitted and the trial court made the following remarks. "Historically, the mother of a child borne out of wedlock has been the sole person concerned with that child. The father of an illegitimate child historically didn't have any say. He didn't have to be advised of the fact that the child was going to be placed for adoption. As the unwed father, he'd have no more rights than anybody else who is a stranger to the child. The legislature has made a change in the law in recent years. The legislature has declared that the unwed father of a child has the same paternal rights that anybody else who fathered a child would have.

"That's added a real complication to what used to be a relatively easy situation to deal with. The adopting parents, again historically, have had the problem of the mother changing her mind, particularly in a private adoption, and the years that I practiced law I encountered that very often, often enough so it would make me very apprehensive to place a child for adoption, because on those occasions when the child was removed from the adopting parents, it created utter chaos. I heard a lot of testimony from a lot of child psychiatrists that said it was a dangerous thing to do, to let the child bond with one set of parents and take them away. Yet under the law the mother had that right, and unless the mother had consented in a particular fashion that was prescribed by law, that consent is revocable.

"Now, in light of those changes, I have to consider the rights of both the mother and the father as being equal in this situation. The father consented to this adoption. He agreed, but there has never been a statutory consent. There's never been a consent in compliance with the law. And that consent is no more binding on this man than the consent of the mother would be, and each of them have the right to change their minds. Each of them have a right to object to the adoption. That's what the father has done.

"Now, I'm going to have to take a look at what's best. I'm being asked here to cut off the rights of the child's father and that the Court is most reluctant to do and would seldom do. I can't imagine any court doing it other than by statutory direction. The father wants to raise the child. The father indicates to the Court that he has an appropriate home in which to raise the child. He's a sailor. But sailors have children, and there are a lot of fathers out in the Persian Gulf right now serving on warships, and they won't see their children for months. And that's just one of the things that

happen when you're a sailor. You go to sea and you do lose contact with your family.

"I think this father has a better circumstance. He's not gone for long periods of time; he's gone for short periods. And I think the child in the father's home would be properly cared for. I don't think the child would be deprived of anything. Perhaps he is in the process of maturing and growing up, but I see nothing that would suggest to me he can't handle this situation.

"On the other hand, I don't think that the mother would be the appropriate custodial parent. I'm going to place the custody of the child with the father, and the parties can work out an appropriate visitation program whenever they want to. If they can't, bring it back before me and I'll deal with that."

Thereafter, the trial court directed Jermstad's counsel to draft an appropriate judgment. The judgment was prepared, executed, and entered. McNelis filed an appeal the next day. She sought a writ of supersedeas in this court and her petition was denied. She sought review of that denial in the California Supreme Court and was unsuccessful.

## DISCUSSION

McNelis contends that the trial court erred in failing to require joinder of the Ellisons, interfered with her paramount right to place the child with adoptive parents, and granted Jermstad an improper parental preference. We review these contentions seriatim.

## I

### *Compulsory Joinder*

McNelis advances the rights of the prospective adoptive parents, the Ellisons, in claiming that the judgment is defective because they were not joined as parties to the action.

A claim of error in failing to join an absent party presents an issue of compulsory joinder under Code of Civil Procedure section 389. Neither party mentions the statute nor formulates arguments within the framework of the compulsory joinder doctrine. They differ about whether the Ellisons are "necessary parties" and McNelis argues that the trial court was obliged

by the terms or policy of the Uniform Parentage Act to order the joinder of the Ellisons sua sponte. As appears, the joinder issue was not properly raised in the trial court and is not cognizable on appeal.

Section 389 provides in pertinent part: "(a) A person . . . shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest . . . . If he has not been so joined, the court shall order that he be made a party." In applying this section we shall assume for the sake of argument that prospective adoptive parents who have filed a petition for adoption are within the ambit of section 389, subdivision (a)(2)(i). Nonetheless, a claim of error in failing to join such an absent party is not cognizable on appeal unless it is appropriately raised in the trial court or there is some compelling reason of equity or policy which warrants belated consideration. (See, e.g., *Krause* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 363-371 [140 Cal.Rptr. 744]; 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 168.) Here that test is not met.

## A.

The only candidate in the record for raising the issue of compulsory joinder is the demurrer filed by McNelis on grounds of misjoinder.[1] It fails as a vehicle for tendering the issue of compulsory joinder because it did not alert the trial court that such a claim was tendered. There was no mention of compulsory joinder and the sole point and authority offered in support of the demurrer refers to permissive joinder, a ground not subject to demurrer.

■ A demurrer for nonjoinder is a special demurrer. McNelis was required to support such a demurrer with a memorandum of points and authorities supporting the ground of demurrer and did not. (Cal. Rules of Court, rule 313.) Failure to provide such support may be deemed a waiver. (See *ibid*.) ■ In view of McNelis's failure to mention compulsory joinder, an unilluminating oral argument, and the failure to press this claim of correctable defect prior to the trial, we conclude that the issue of error in failing to grant compulsory joinder is waived.

## B.

■ That leaves McNelis with the burden of establishing a compelling reason of equity or policy which warrants cognizance of her belated claim.

---

[1] We note the misnomer "misjoinder," a term for joinder of too many parties. (See 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 922.)

Under this heading we group her remaining arguments which impliedly assert that the policy and provisions of the Uniform Parentage Act afford such a reason.

McNelis argues that joinder of the prospective adoptive parents is compelled by Civil Code section 7006, subdivision (c).[2] It requires that an action such as this one shall be consolidated with an action for termination of parental rights of an alleged father under Civil Code section, 7017, subdivision (b)[3] and that the parental rights of the natural father shall be determined as set forth in section 7017, subdivision (d).[4] McNelis implies that a

---

[2] Section 7006, subdivision (c), at the time of trial read as follows. "An action to determine the existence of the father and child relationship with respect to a child who has no presumed father under Section 7004 or whose presumed father is deceased may be brought by the child or personal representative of the child, the State Department of Social Services, the mother or the personal representative or a parent of the mother if the mother has died or is a minor, a man alleged or alleging himself to be the father, or the personal representative or a parent of the alleged father if the alleged father has died or is a minor. Such an action shall be consolidated with a proceeding pursuant to subdivision (b) of Section 7017. The parental rights of the alleged natural father shall be determined as set forth in subdivision (d) of Section 7017." (Stats. 1986, ch. 1408, § 3.)

All references to sections in this opinion are to the Civil Code unless otherwise made apparent.

[3] Section 7017, subdivision (b) is as follows. "(b) If a mother relinquishes for, consents to, or proposes to relinquish for or consent to the adoption of a child who does not have (1) a presumed father under subdivision (a) of Section 7004 or (2) a father as to whom the child is a legitimate child under prior law of this state or under the law of another jurisdiction, or if a child otherwise becomes the subject of an adoption proceeding and the alleged father, if any, has not, in writing, denied paternity, waived his right to notice, voluntarily relinquished or consented to the adoption, the agency or person to whom the child has been or is to be relinquished, or the mother or the person having custody of the child, shall file a petition in the superior court to terminate the parental rights of the father, unless the father's relationship to the child has been previously terminated or determined not to exist by a court, or unless the father has been served as prescribed in subdivision (f) with a written notice alleging that he is or could be the natural father of the child to be adopted or placed for adoption and has failed to bring an action for the purpose of declaring the existence of the father and child relationship pursuant to subdivision (c) of Section 7006 within 30 days of service of the notice or the birth of the child, whichever is later."

[4] Section 7017, subdivision (d), is as follows. "(1) If, after the inquiry, the natural father is identified to the satisfaction of the court, or if more than one man is identified as a possible father, each shall be given notice of the proceeding in accordance with subdivision (f), unless he has been served with a written notice alleging that he is or could be the natural father of the child to be adopted, or placed or relinquished for adoption and has failed to bring an action pursuant to subdivision (c) of Section 7006 to declare the existence of the father and child relationship within 30 days of serving the notice or the birth of the child, whichever is later. If any of them fails to appear or, if appearing, fails to claim parental rights, his parental rights with reference to the child shall be terminated. [¶] (2) If the natural father or a man representing himself to be the natural father claims parental rights, the court shall determine if he is the father. The court shall then determine if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the father to obtain custody, the age and prior placement of the child and the effects

determination under section 7017, subdivision (d), cannot be made without joinder of the prospective adoptive parents. The argument is not persuasive.

McNelis suggests that under the consolidation provisions of section 7006, subdivision (c) (fn. 2, *ante*) the section 7006 proceeding should have been consolidated with the Ellisons' adoption proceeding. However, section 7006 does not apply to an adoption proceeding; it requires consolidation of the 7006 proceeding with a proceeding under section 7017. A proceeding under section 7017, subdivision (b), to terminate the rights of a natural parent is *not* an adoption proceeding. It is an independent action initiated by a petition that may be brought by an adoption agency, the prospective adoptive parents, *or* the mother. (*Ibid.*)

An action to determine paternity under section 7006, subdivision (c), could be brought in circumstances to which section 7017, subdivision (b), is inapplicable, e.g., where no adoption is contemplated. Hence, section 7006, subdivision (c), cannot be read to require that a termination proceeding be filed to enable consolidation whenever such a paternity action is commenced. If no such proceeding is pending there is nothing to consolidate. This is made explicit in the 1987 amendment to section 7006, subdivision (c): "Such an action shall be consolidated with a proceeding pursuant to subdivision (b) of Section 7017 *if a proceeding has been filed under Section 7017.*" (The italicized words were added by Stats. 1987, ch. 114, § 1.) This statutory change makes explicit what was implicit. (See *California State Auto. Assn. Inter-Ins. Bureau* v. *Bourne* (1984) 162 Cal.App.3d 89, 93 [208 Cal.Rptr. 131].)

There is no indication that a termination proceeding under section 7017, subdivision (b), was filed prior to the entry of judgment in this case. Since there was no such proceeding with which this action could be consolidated there was no error in failing to adhere to the inapplicable requirement of section 7017, subdivision (b). Additionally, the question of consolidation of the adoption proceeding and this action is not presented because no motion for consolidation was made.

McNelis also claims that joinder is compelled because, regardless of a pending termination proceeding, the parental rights in the section 7006,

---

of a change of placement on the child. If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, it shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the father, or that if he is the father it is in the child's best interest that an adoption be allowed to proceed, it shall order that that person's consent is not required for an adoption; such a finding terminates all parental rights and responsibilities with respect to the child. Section 4600 does not apply to this proceeding. Nothing in this section changes the rights of a presumed father."

subdivision (c), paternity action must nonetheless "be determined as set forth in subdivision (d) of Section 7017." McNelis reasons that the substantive standard for termination of parental rights embedded in subdivision (d) requires comparison of the prospective adoptive parents with the natural father and that, accordingly, they must be joined to enable such a comparison. We later disagree with the claim of right to comparison.

For purposes of the present argument we assume that the premise concerning comparative analysis is correct. The conclusion that joinder is necessary to enable this comparison does not follow. If such comparison is warranted it may be accomplished by evidence adduced by one of the parties to the section 7006 action. One does not have to be a party to be a witness nor to have evidence adduced concerning one's circumstances. The existence of a comparative standard would not entail the requirement that the prospective adoptive parents must be joined as parties.

## C.

To the extent that McNelis's joinder claim is at all sympathetic it is because of the vicarious claim of the absent third parties. Viewing that claim directly, we do not find it compelling. The record discloses that the Ellisons had actual notice of this action from the outset. They were represented by counsel with whom counsel for McNelis maintained liaison, and were put on informal notice of Jermstad's paternity action by the direction of the trial court requiring notice to the clerk of the superior court in which the adoption proceeding was pending.[5] Yet the Ellisons never moved to intervene in the proceedings to press their own interest. In the circumstances of this case, the provision of actual notice of this action to the Ellisons leaves the vicarious aspect of McNelis's nonjoinder claim bereft of equitable force. They must be deemed to have elected to have McNelis act as their surrogate.

---

[5] This sua sponte action of the trial court complies with the spirit of the compulsory joinder provision. The Advisory Committee note to Rule 19, Federal Rules of Civil Procedure, is incorporated into the California Law Revision Commission Comment to Code of Civil Procedure section 389 as "particularly helpful in describing the nature and effect of Section 389." The note says in pertinent part: "In some situations it may be desirable to advise a person who has not been joined of the fact that the action is pending, and in particular cases the court in its discretion may itself convey this information by directing a letter or other informal notice to the absentee." (14 West's Ann. Code Civ. Proc. (1973 ed.) p. 227; Deering's Ann. Code Civ. Proc., § 389 (1972 ed.) p. 435.) Here the trial court intuitively perceived and complied with this suggestion.

## II

■ McNelis contends that the trial court erred in failing to terminate Jermstad's parental rights solely because he was not a man presumed to be a father under section 7004, subdivision (a).[6] We disagree.

A presumed father generally is one who claims paternity who is the lawful husband, putative husband, or husband in a voidable marriage. McNelis argues that if the natural father is not a presumed father the natural mother of the child has a right to place the child for adoption regardless of the wishes of the natural father. She founds this right upon the remark in the majority opinions in *Adoption of Marie R.* (1978) 79 Cal.App.3d 624 [145 Cal.Rptr. 122] and *W.E.J.* v. *Superior Court* (1979) 100 Cal.App.3d 303 [160 Cal.Rptr. 862] that a natural mother may prevent a natural father from acquiring the status of a presumed father. She reasons that since only the consent of a presumed father is required for an adoption, the mother has the "right" to have the child adopted regardless of the wishes and conduct of a natural father who is not a presumed father. As next appears, the remark upon which McNelis relies does not square with the provisions of the Uniform Parentage Act and the cases upon which she relies do not warrant acceptance of her contention.

*Adoption of Marie R., supra,* reversed an order in favor of a natural father staying an adoption proceeding. The order had been premised on the conclusion that he was a presumed father, under section 7004, subdivision (4), by virtue of the "constructive" receipt of the child into his home. The natural father had filed an action to establish the father and child relationship under section 7006 but that action had not gone to judgment. (79 Cal.App.3d at p. 626.) The majority opinion rejected the theory of constructive receipt and reversed the order. The opinion noted that "[t]he cases have recognized that a mother may, by her conduct, prevent a natural father from securing even the minimal contact with the child that old section 230 required. (*Adoption of Rebecca B.* (1977) 68 Cal.App.3d 193, 198 [ ]; *In re Reyna* (1976) 55 Cal.App.3d 288, 300 [ ].) Absent even the minimal contact

---

[6]Section 7004, subdivision (a) is as follows. "A man is presumed to be the natural father of a child if he meets the conditions as set forth in Section 621 of the Evidence Code [a husband, not impotent or sterile, cohabiting with his wife who gives birth to the child] or in any of the following paragraphs: [¶] (1) [He is a husband and there is a child of the marriage born within 300 days of termination of the marriage.] [¶] (2) [He is a putative husband and there is a child of the void or voidable attempted marriage before birth born within 300 days of voiding of the marriage or if void at the outset 300 days from the end of cohabitation.] [¶] (3) [He is a husband of a marriage or void or voidable marriage after the child's birth and he is named as father on the birth certificate with his consent or he is obligated to support the child under a written promise or by court order.] [¶] (4) He receives the child into his home and openly holds out the child as his natural child."

recognized in the cases above cited, there can be no receipt, constructive or otherwise, into the home of a purported father." (*Marie R., supra,* at p. 630.) McNelis relies upon this language as authority for her claim. This reliance is mistaken.

The cases upon which the language in *Adoption of Marie R.* is founded did not arise under the Uniform Parentage Act, which governs this case. *Adoption of Rebecca B.* arose under the legitimation statutes which preceded the Uniform Parentage Act. A footnote caveat in the opinion addresses this point. It points out that under the Uniform Parentage Act the judgment in an action to establish the father and child relationship under section 7006 could order that sufficient custody be granted the natural father to permit him to become a presumed father. (*Adoption of Rebecca B., supra,* 68 Cal.App.3d at p. 198, fn. 4; accord *In re Tricia M.* (1977) 74 Cal.App.3d 125, 135-136 [141 Cal.Rptr. 554]; but see generally, *W.E.J.* v. *Superior Court, supra,* 100 Cal.App.3d at pp. 310-311.)

The caveat is based upon the language of the Uniform Parentage Act. "[Such a judgment] may contain any other provision directed against the appropriate party to the proceeding, concerning the duty of support, the custody and guardianship of the child, visitation privileges with the child, . . . or any other matter in the best interest of the child. . . ." (§ 7010, subd. (c).) If the trial court, in the section 7006 action, deems it to be in the best interest of the child it may grant sufficient custody to the natural father to permit him to receive the child into his home and openly hold out the child as his natural child.[7] This will result in the natural father acquiring the status of a presumed father whose consent is necessary for adoption. (§§ 224, 7003.)[8] Despite the wishes of the mother, under the Uniform Parentage Act the natural father may acquire the status of a presumed father. (Cf. *Griffith* v. *Gibson, supra,* 73 Cal.App.3d 465.)

In *W.E.J.* v. *Superior Court, supra,* the court reiterated the ill-considered remark from *Adoption of Marie R.* Nonetheless, the holding squarely con-

---

[7] For this reason McNelis's reliance upon section 197 is unavailing. Section 197 is as follows. "The mother of an unmarried minor child is entitled to its custody, services and earnings. The father of the child, if presumed to be the father under subdivision (a) of Section 7004, is equally entitled to the custody, services and earnings of the unmarried minor. If either the father or mother be dead or unable or refuse to take the custody or has abandoned his or her family, the other is entitled to its custody, services and earnings." Section 197 does not preclude the acquisition of a custodial right under other provisions of the law, e.g., section 7010. (See *Griffith* v. *Gibson* (1977) 73 Cal.App.3d 465, 473-474 [142 Cal.Rptr. 176].) If it did there could be, inter alia, no adoptions.

[8] Section 224, in the portion of the Civil Code concerning adoption procedure, provides in essence that if there is a presumed father the child cannot be adopted without the consent of "its parents," but if not the child cannot be adopted without the consent of "its mother."

tradicts the remark. The case arose as a writ proceeding addressed to action of the trial court in an adoption proceeding. While declaring that a natural father who was not yet a presumed father could not veto an adoption, the court of appeal remanded the matter to the trial court with the direction that the natural father could "pursue his request for custody based upon his parenthood . . . ." (100 Cal.App.3d at p. 315.) The concurring opinion clarified that direction. "The trial court is directed (as it has not yet done) to consider, whether it will be adverse to the best interests of the child to give custody to the father. If it so concludes, it may then proceed with the adoption. If, however, it should conclude that custody in the father would not be adverse to the best interests of the child, it may award custody to the father and deny the petition for adoption." (*Id.,* at pp. 315-316, conc. opn. of Kingsley, J.)

## III

### *Parental Preference*

■ McNelis next claims that the trial court erred because it accorded Jermstad a parental preference in conflict with section 7006, subdivision (c) of the Uniform Parentage Act. We disagree.

### A.

The paternal rights of a natural father who is not a presumed father are addressed in section 7017, subdivision (d)(2). It provides: "If the natural father or a man representing himself to be the natural father claims parental rights, the court shall determine if he is the father. The court shall then determine if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the father to obtain custody, the age and prior placement of the child and the effects of a change of placement on the child. If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, it shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the father, or that if he is the father it is in the child's best interest that an adoption be allowed to proceed, it shall order that that person's consent is not required for an adoption; such a finding terminates all parental rights and responsibilities with respect to the child. Section 4600 does not apply to this proceeding. Nothing in this section changes the rights of a presumed father."

The bulk of this language derives from a 1986 amendment of the subdivision. (Compare Stats. 1979, ch. 752, with Stats. 1986, ch. 1370.) The amendment added the provision that section 4600[9] does not apply to a section 7017 proceeding. Section 4600 mandates a broad-ranging parental preference in custody matters. McNelis argues that the effect of the amendment is to prohibit a parental preference in a section 7006, subdivision (c), proceeding and to require a comparison on an equal footing of the child-rearing potential of the natural father with those of the prospective adoptive parents. She suggests that the candidate that appears the better prospect as a parent must in all cases prevail.

McNelis's reading of the amended statute is untenable since it would deny the natural father the equal protection of the laws which applies in cases, such as this one, in which the natural father promptly seeks to shoulder the burdens of paternity. We read section 7017 in conformity with the Constitution where, as here, its language lends itself to a construction consistent with the higher law. The natural father must be afforded a parental preference under the amended statute where he promptly acknowledges paternity and seeks custody of the child.

The demonstration of these points of law requires an examination of the case law which preceded the amendment of the statute. We first turn to the opinions of the United States Supreme Court which chart the constitutional shoals to be avoided.

### B.

Our survey begins with *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208]. In that case the United States Supreme Court held, on grounds of equal protection and due process, that Illinois could not terminate the parental rights of an unmarried father who had custody of his children predicated on a presumption of unfitness when all other parents were entitled to notice, a hearing, and protection against removal by a requirement of proof of unfitness.

---

[9] Section 4600 provides that in any proceeding where child custody is at issue custody should be awarded under an order of preference in which parents are listed first. It also provides that an award of custody to a person other than a parent without the consent of the parents may only be made upon a finding that an award of custody to a parent would be detrimental to the child. Such a finding requires a clear showing that the award of custody to a nonparent is essential to avert harm to the child. (*In re B.G.* (1974) 11 Cal.3d 679, 699 [114 Cal.Rptr. 444, 523, P.2d 244].) Section 4600 was held applicable to a natural father seeking custody in termination of paternal rights proceedings, under section 7017, subdivision (d), in *In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918], discussed *post.*

*Stanley* was held not to apply in *Quilloin* v. *Walcott* (1978) 434 U.S. 246 [54 L.Ed.2d 511, 98 S.Ct. 549]. The court unanimously rejected the parental claim of an unwed father who sought to establish legitimacy and prevent adoption of a 12-year-old child by her stepfather. The unwed father never had nor sought custody. The court held that in these circumstances due process of law required only that the adoption and denial of legitimation be in the best interests of the child. (*Id.,* at p. 256 [54 L.Ed.2d at p. 520].) As to a claim of equal protection, the unwed father was deemed not similarly situated to a married father because a married father would have shouldered the burden of custody at some point. (*Ibid.*)

In *Caban* v. *Mohammed* (1979) 441 U.S. 380 [60 L.Ed.2d 297, 99 S.Ct. 1760], the court decided that an unwed father who had lived with the mother and their two children for several years was denied equal protection of the laws by a New York statute which granted the unwed mother but not the unwed father a right to veto adoption. The question arose on cross-petitions for adoption of the children by the unwed parents and their respective spouses. The court said that the distinction did not bear a substantial relation to the state's proffered interest in providing adoptive homes for its illegitimate children. (*Id.,* at p. 391 [60 L.Ed.2d at pp. 306-307].) The court left open the question whether "the special difficulties attendant upon locating and identifying unwed fathers at birth would justify a legislative distinction between mothers and fathers of newborns . . . ." (*Id.,* at p. 392 [60 L.Ed.2d at p. 307]; fn. omitted.) The court added: "Because the question is not before us, we express no view whether such difficulties would justify a statute addressed particularly to newborn adoptions, setting forth more stringent requirements concerning the acknowledgment of paternity or a stricter definition of abandonment." (*Id.,* at p. 392, fn. 11 [60 L.Ed.2d at p. 307].)

The most recent case is *Lehr* v. *Robertson* (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985]. In *Lehr* the unwed father raised a *Stanley/Caban* challenge based on the failure to give him advance notice of a proceeding to adopt his two-year-old daughter. He had not lived with the mother or the daughter after her birth, never provided financial support and never offered to marry the mother. (*Id.,* at p. 252 [77 L.Ed.2d at p. 621].) The mother's spouse filed an adoption petition and as the case neared completion the unwed father filed a petition seeking to establish paternity, his support obligation, and visitation rights. The court in the adoption proceeding was notified but nonetheless entered a judgment without notice to the unwed father. The high court held that due process concerns were met by New York's establishment of a putative father registry which would

have afforded notice if the unwed father had availed himself of that opportunity. (*Id.*, at pp. 256-265 [77 L.Ed.2d at pp. 623-629].)

As to the due process interest of the unwed father premised on "the mere existence of a biological link" *Lehr* held that it did not merit heightened constitutional protection where "an unwed father [did not] demonstrate[ ] a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' . . . ." (*Lehr, supra,* 463 U.S. at p. 261 [77 L.Ed.2d at p. 626].) "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie." (*Id.,* at p. 262 [77 L.Ed.2d at p. 627].)

The equal protection claim was rejected in *Lehr* "[b]ecause [the unwed father] never established a substantial relationship with his daughter . . . the New York statutes at issue in this case did not operate to deny [him] equal protection." (463 U.S. at p. 267 [77 L.Ed.2d at p. 630].) The *Lehr* majority found a lack of substantial relationship in that the father "has never had any significant custodial, personal, or financial relationship with [the child], and he did not seek to establish a legal tie until after she was two years old." (*Id.,* at p. 262 [77 L.Ed.2d at p. 627]; fn. omitted.)

With these opinions in mind we turn to the California case law.

## C.

The first case in point is *Adoption of Baby Boy D.* (1984) 159 Cal.App.3d 8, 17-22 [205 Cal.Rptr. 361]. The court held that the parental preference doctrine expressed by section 4600 must be applied, without apparent limitation, in favor of a natural father in a section 7017 proceeding because of federal constitutional constraints of due process and equal protection of the laws. The natural father apparently had not established a substantial relationship with the child as provided by *Lehr.* He had delayed his claim for custody for almost a year during which the child was in the custody of the prospective adoptive parents. The opinion in *Adoption of Baby Boy D.* relies in essence on *Stanley.* There is no mention of *Lehr* or *Quilloin* and *Caban* is only mentioned after the fact of the holding that section 4600 is perforce applicable in section 7017 proceedings.

The California Supreme Court addressed this subject in *In re Baby Girl M., supra,* 37 Cal.3d 65. In that case the child was born on July 18, the natural father sought custody of his child on August 17 and the child was placed with prospective adoptive parents on August 24. The section 7017 hearing to terminate parental rights was held in December. The trial court found that the natural father was the biological father and that he was a good parent who could provide a good home for the child. Nonetheless, it terminated his parental rights on the ground that it was in the child's best interests to remain with the adoptive parents. The Supreme Court reversed the order terminating the natural father's rights. (*Id.,* at p. 68.)

The court held that under the statutes, as they read before the 1986 amendment to section 7017, subdivision (d)(2), section 4600 is applicable in section 7017 proceedings. The precise grounds of the holding are unclear. The majority opinion arrived at this conclusion by reading the statutes in the light of constitutional constraints. ██ (37 Cal.3d at pp. 68-73.)[10] The analysis strongly suggests that, under *Stanley, Caban, Quilloin,* and *Lehr* a parental preference is required in these circumstances as a matter of federal constitutional law. (*In re Baby Girl M., supra,* 37 Cal.3d at pp. 73-75.) The majority opinion quoted with approval the conclusion of a law review article, Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson* (1984) 45 Ohio St.L.J. at page 313: "'Recognition of an opportunity interest in unwed fathers requires a conclusion that if the two elements of a constitutionally protected parent-child relationship are the biological link and commitment to and exercise of custodial responsibility, the state may not deny biological parents the opportunity to establish a protected custodial relationship.'" (*Id.,* at p. 74) This point was strenuously disputed by the dissenting opinion which contends that under *Lehr* "due process requires nothing more than notification to the natural father that his rights may be terminated." (*Id.,* at p. 81, dis. opn. of Mosk, J.)

The holding in *In re Baby Girl M.* was questioned by three members of the Supreme Court in *Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 796-797 [218 Cal.Rptr. 39, 705 P.2d 362], concurring opinions of Kaus, J. and Mosk, J. However, a majority of the justices did not reconsider the precedent. The lead opinion overturned an order granting temporary custody to a natural father who was himself a minor on the ground that the record

---

[10] When a statute is interpreted in the light of constitutional concerns, the constitutional law provides criteria for the application of the statute. To this extent the opinion is authority for a proposition of constitutional law. (See Amsterdam, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67.)

contained uncontroverted evidence indicating that he lacked the maturity needed to care for a child and that altering custody of the infant after he had established a bond with the prospective adoptive parents would be detrimental. (*Id.,* at p. 793.)

The amendment of section 7017 in 1986, which stated that section 4600 does not apply, came after these cases, a matter to which we now turn.

### D.

McNelis claims that the effect of the amendment making section 4600 inapplicable is to prohibit a parental preference in section 7017 proceedings. She views the amendment as a repudiation of the reasoning of *In re Baby Girl M.* and suggests that the amendment "overrules" that case. (See *Adoption of Christopher S.* (1987) 197 Cal.App.3d 433, 438 [242 Cal.Rptr. 866].)

There are two impediments to this sweeping claim. ■ The first is that to the extent that the majority opinion in *In re Baby Girl M.* rests on federal constitutional considerations it is not subject to being overturned by a legislative enactment. It is binding until it is reconsidered by the California Supreme Court or conclusively undermined by the United States Supreme Court. ■ The second impediment is that the totality of the changes worked by the 1986 amendment suggest that the statute does not prohibit a parental preference, but rather frees the trial court from the constraints of section 4600 in circumstances in which a parental preference is not supported by constitutional considerations.

The linkage between the holding of *In re Baby Girl M.* and the federal constitutional restrictions on state action denying biological parents the opportunity to establish a protected custodial relationship is implicit rather than explicit. Even assuming, for the sake of argument, that the remarks addressed to that subject in the majority opinion in *In re Baby Girl M.* are dicta and that we are free to act upon a contrary view of the matter, we are not persuaded that the contrary view is correct as a matter of statutory construction. Regardless of compulsion, the views expressed in a majority opinion of our Supreme Court are entitled to respectful deference in the absence of persuasive argument to the contrary. No such arguments appear.

We are not persuaded by the argument in the dissenting opinion in *In re Baby Girl M.* because it does not account for the remarks in *Lehr* indicating

that there is constitutionally cognizable interest in an opportunity of the natural father to acquire substantial protection under the due process clause by shouldering the burdens of parentage. Nor does the dissenting opinion address *Caban,* or the rejection in *Lehr* of the natural father's equal protection claim under *Caban* because he had never established a "substantial relationship" with his daughter in the two years following her birth. In our judgment the view endorsed in the majority opinion in *In re Baby Girl M.* that " 'the state may not deny biological parents the opportunity to establish a protected custodial relationship' " is the better reading of the case law of the United States Supreme Court.

Following that lead we may not read the amendment of section 7017 as denying a constitutionally afforded opportunity unless such an intention is unmistakable. (See, e.g., *People* v. *Amor* (1974) 12 Cal.3d 20, 30 [114 Cal.Rptr. 765, 523 P.2d 1173].) If we read the amendment as barring a parental preference in cases where the natural father has promptly come forward to grasp his opportunity interest and diligently pursued that interest we effectively deny these "biological parents the opportunity to establish a protected custodial relationship." The opportunity for protection of a custodial relationship is illusory if it is subject to being nipped in the bud by application of an unprotected best interest of the child comparison with prospective adoptive parents.

However, we do not discern in the 1986 amendment an intention to infringe the opportunity interest of the natural father in this manner. Indeed it appears to have been crafted with the contrary end in view. That is so notwithstanding the new proviso declaring that section 4600 does not apply, for this is not the only alteration wrought by the 1986 amendments to section 7017. The amended text specifies the *criteria* material to the determination whether "it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed." Of significance it directs that "[t]he court, in making that determination, may consider all relevant evidence, including the efforts made by the father to obtain custody . . . ." This consideration conditions the best interest test and meshes with the federal constitutional concerns.

■ We are constrained to read section 7017, subdivision (d)(2) in a manner which avoids a potential for conflict with the federal Constitution. (See, e.g., *Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 394 [211 Cal.Rptr. 758, 696 P.2d 150].) ■ If read to bar a parental preference to a natural father who has appropriately grasped his custodial opportunity interest the statute would present such a conflict. The statute, as we said, lends itself to conformity

with the constitutional concerns. In a case where the natural father has diligently sought to shoulder the burdens of the paternal relationship, including the burden of custody, the requirement of parental preference arises from the federal Constitution. Accordingly, the statutory criteria of section 7017 for the best interest of the child regarding retention of parental rights under the statute must be read in the light of this requirement. The statute admits of such an accommodation.

### E.

Jermstad gave notice of intention to seek custody on the day of the birth of the child. He pursued an adjudication of his claim with exemplary diligence. If this is not a satisfactory " 'com[ing] forward to participate in the rearing of his child' " (*Lehr, supra,* 463 U.S. at p. 261 [77 L.Ed.2d at p. 626]) then there is no manner in which that can be accomplished and the language expressive of parental right in the opinions of the United States Supreme Court is empty. Hence, we conclude that the standard applicable to Jermstad's claim must include a parental preference which precludes termination of his paternal rights in circumstances in which he has satisfied the constitutional requirements.

This does not mean that the amendment of section 7017 worked no change in stating that section 4600 is inapplicable. Under the holding of *In re Baby Girl M.* the parental preference called for by section 4600 had to be applied in favor of every natural father, regardless of whether he had grasped the opportunity afforded by his biological status in a manner sufficient to establish a constitutionally significant tie for purposes of equal protection as required by *Lehr*. A natural father who had taken no responsibility for the child and wholly failed to act to establish a substantial relationship years after the birth would nonetheless be accorded a parental preference. Such a preference cannot be grounded on a federal constitutional requirement in light of the reasoning in *Lehr* and *Quilloin*. Had section 4600 applied in those circumstances the natural father in *Quilloin* and in *Lehr* would have been entitled to a parental preference.

The Legislature was free to alter the rule of *In re Baby Girl M.* within the constitutional constraints there recognized. That is what was accomplished by the amendment of the statute.

### F.

Lastly, McNelis cannot prevail in any event. ■ A statement of decision is required upon request in a custody proceeding such as this. (*Michael*

*U.* v. *Jamie B., supra,* 39 Cal.3d at pp. 792-793, pl. opn. of Broussard, J. and p. 798, dis. opn. of Reynoso, J.) Where there is no request for a statement of decision in such a case "all intendments favor the ruling below, and we must assume that the trial court made whatever findings are necessary to sustain the judgment." (*Id.,* at pp. 792-793; citation omitted.) In this case the essential finding is that an award of custody to Jermstad would be in the best interest of the child. "Consequently, the only issue before us is whether substantial evidence supports that implied finding." (*Id.,* at p. 793.)

Where a party is entitled to a statement of decision and does not request one it is unfair to attack the decision based upon the informal, oral remarks of the trial court. Even if those remarks display some apparent misconceptions concerning the topic of the decision, such misconceptions may not have been dispositive. If the party who complains had requested a statement of decision there would have been an opportunity to formally articulate the basis of decision and clarify alternative grounds prior to judgment, indeed to rethink the basis for decision. Having waived this opportunity the appellant is subject to having the judgment upheld if there is substantial evidence adequate for the essential findings implied in its support. This reasoning is doubly forceful when the judgment concerns a custodial placement since the likely harm of undoing the placement pending resolution of the appeal is attributable to the appellant's failure to request a statement of decision.

 McNelis does argue that there is insufficient evidence to support the finding that an award of custody to Jermstad was in the best interest of the child. However, the bulk of her argument is a recitation of the evidence in the light most favorable to her effort to overturn the judgment. This viewpoint is the exact opposite of the one that is applicable to our review. We must consider the evidence in the light most favorable to Jermstad, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment. (See, e.g., 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278.) Viewed in that light there is substantial evidence in support of the trial court's essential finding even if we accept for the sake of argument that the applicable standard required comparison of Jermstad with the Ellisons without the benefit of a parental preference.

No substantial evidence claims are of two kinds. Sometimes the claim is that the evidence does address the elements of the pertinent standard but does not afford a permissive inference critical to some element. However, usually the claim is that the evidence is inadequate because it does not address all of the elements of the pertinent standard. In such a case the dispute is about the nature of the standard. Here, if we assume that McNelis is correct about the standard, the question is whether any rational trier of

fact could infer after comparison of Jermstad with the assumption that the Ellisons were "A number 1" parents that it is in the best interest of the child that he retain his parental rights. The answer is yes.

■■■ The standard of best interest of the child has consistently been viewed as necessarily conferring upon the trial court a large measure of discretion in assigning custody between parties competing on an "equal footing." (See, e.g., 6 Witkin, Summary of Cal. Law (8th ed. 1974) Parent and Child, § 72.) This stems from the subtle task at hand. The best interest of the child is in being raised by the best parent. But that is not a matter that can be ascertained by crude calculation. "[The] essence [of parenting] lies in the ethical, emotional, and intellectual guidance the parent gives to the child throughout his formative years, and often beyond. The source of this guidance is the adult's own experience of life; its motive power is parental love and concern for the child's well-being; and its teachings deal with such fundamental matters as the child's feelings about himself, his relationships with others, his system of values, his standards of conduct, his goals and priorities in life." (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 739 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028].)

Absent some compelling indication that a contending candidate parent cannot be an adequate parent, the determination of which candidate will be more adequate must be left to the trial court, which enjoys the advantages of a first hand evaluation. ■■■ On this record, viewed in the light most favorable to the judgment, we cannot say that Jermstad cannot be an adequate parent; we cannot say that he will be other than "A Number 1." Moreover, regardless of parental preference, we do not read the statute as requiring the trier of fact to disregard the fact of biological paternity as a consideration in favor of retention of the parental rights of the natural father. The weight to accord this consideration in cases where the natural father is not entitled to a parental preference is for the trial court. However, if the trial court decides that it is in the best interest of the child that the natural father retain his paternal rights it may support its determination in part upon the biological tie.

For all of the foregoing reasons we find McNelis's contention not meritorious.

### Disposition

None of McNelis's remaining arguments warrant protracted discussion in light of our resolution of the points already discussed. Contrary to the argument of McNelis the record reflects that the trial court considered the effects of a change in placement of the infant. In any event, we would imply such consideration in view of the failure to seek a statement of decision. We

cannot fault a conclusion that the change in placement of the child at the age here in issue would not be likely to be harmful to the child. There was no abuse of discretion in the determination that in light of the facts of this case it is in the best interest of the child that Jermstad retain his parental rights.

The judgment is affirmed.

Evans, Acting P. J., and Deegan, J.,* concurred.

A petition for a rehearing was denied June 8, 1989.

---

* Assigned by the Chairperson of the Judicial Council.